1

2

3

4

5

6

7

8

9

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

10

| | | |
|---|---|---|
| ZERLEAN COOPER, | ) | 1:10-cv-899  AWI DLB |
| | ) | |
| **Plaintiff**, | ) | |
| **v.** | ) | **ORDER ON DEFENDANTS'** |
| | ) | **MOTION TO DISMISS** |
| MATTHEW CATE, Secretary of the | ) | |
| California Department of Corrections & | ) | |
| Rehabilitation, et al., | ) | (Doc. No. 44) |
| | ) | |
| **Defendants.** | ) | |

11

12

13

14

15

16

17

18     This is an employment discrimination case brought by Plaintiff Zerlean Cooper

19 ("Cooper") against her former employer the California Department of Corrections and

20 Rehabilitation and Secretary Matthew Cate (collectively "CDC").  Previously, the Court granted

21 in part and denied in part a motion to dismiss the second amended complaint.  The operative

22 complaint is now the Third Amended Complaint ("TAC").[1]  The TAC alleges various violations

23 of Title VII and 29 U.S.C. § 621.  Defendants move under Rule 12(b)(6) to dismiss the Title VII

24 claims.  For the reasons that follow, the Court will grant the motion.

25

26

27     [1]This case was stayed pursuant to stipulation on January 3, 2011, because Cooper had yet to receive a right
to sue letter from the EEOC.  On July 24, 2011, Cooper obtained a right to sue letter and filed an amended

28 complaint.

# BACKGROUND[2]

From the TAC, Cooper is a 56 year old African-American woman.  Cooper began her employment with CDC in 1987.  Over the years, Cooper received numerous certificates from CDC, including certificates for outstanding performance.  In January 1996, Cooper was promoted to the rank of Correctional Lieutenant.  Cooper was assigned to the Central California Women's Facility ("the Prison").  There are approximately 27 correctional lieutenants, and less than 3% of them are African-Americans.  During the relevant time period, Cooper was the Visiting Lieutenant.  At various times, Cooper was responsible for guest and security clearances, mail room, visitations (including several yearly programs), transportation, and parole hearings.

In August 2003, Cooper was a witness in a retaliation complaint filed by a female coworker.  Cooper was questioned and gave true answers about the allegations of retaliation, Cooper's knowledge of the complainant's conversations with the Prison administration, and Cooper's training and knowledge regarding Prison policies and procedures.

On October 5, 2005, a Ms. Sanchez (who was an ex-felon), visited the Prison and called another lieutenant to complain that Cooper would not let Sanchez's children enter the Prison.  Sanchez had not followed the appropriate procedure.  Sanchez used the term "nigger" twice while referring to Cooper during the call.  Neither the lieutenant nor any other individual remonstrated against Sanchez about using the term "nigger" in reference to Cooper.  On October 19, 2005, the prison refused to accept Cooper's complaint against Sanchez for discrimination.  However, on December 26, 2006, the prison's EEO Coordinator B.J. Simmon notified Cooper that they would not accept her complaint about Sanchez because Cooper allegedly failed to establish that she "suffered a specific harm based partly or wholly upon a protected group basis."

On December 9, 2005, Cooper was subjected to violence or the threat of violence.  As Cooper was walking through the central control door, Officer Hack (who was immediately ahead of her) suddenly turned and slammed the door, causing it to hit the wall before it shut.  Later that

---

[2]The Court is required to accept as true all factual allegations in the FAC when resolving a Rule 12(b)(6) motion.  See Marceau v. Blackfeet Hous. Auth., 540 F.3d 916, 919 (9th Cir. 2008).  Accordingly, the factual background section is derived from the factual allegations of TAC and will be used to resolve this motion only.

day, Hack noticed Cooper as she was approaching a sergeant's office, and Hack turned and hit the wall with his fist.  Further, as Cooper entered the program sergeant's office, Hack (who was already in that office) threw papers on the sergeant's desk, walked out, and stood by the gate.

On December 11, 2005, Cooper reported the incident in writing to then Custody Captain Michael Tann ("Tann").  Although this apparently was the second time that Cooper complained about Hack, CDC took no action on the matter.

In December 2006, around the time that CDC refused to act on Cooper's complaint against Sanchez, CDC took away Cooper's office assistant and began to give her undue and excessive workloads and assignments.  Specifically, in addition to being responsible for Visiting, Mail Room, Transportation, Valdivia, Board of Prison Hearings, Gate Security Clearances, Get on the Bus, and Bill Glass,[3] CDC added the Chowchilla Express Buses (a weekly transportation program for children to visit their imprisoned mothers).

On March 5, 2007, Cooper wrote a letter complaining about the undue and excessive work load.  In response, Warden Patrick allowed Cooper to have an office assistant for several months, but did not realign Cooper's workload.

On January 3, 2008, Capt. Harding made a staffing change.  When Cooper spoke to Harding about the change, Harding said: "First of all, I told her (Officer Lingard) that she could keep her job, and the second reason, personally, is that I don't have the balls or huevos to tell her that she could not have the position, and I don't want to eat crow."  Later, in the same conversation, Harding flexed his chest and said, "If you're lucky, I'll get picked up as an associate warden."

On January 17, 2008, Cooper filed a formal complaint against Harding for inappropriate sexist remarks.

On January 22, 2008, Warden Patrick, in front of then Chief Deputy Mary Lattimore ("Lattimore"), made offensive comments to Cooper while discussing job expectations.  Warden Patrick said, ". . . you are not authorized to make any job changes or moves, and you should keep your opinion to yourself because you know how people take it out of context and then it would

---

[3]Cooper had been given these duties two to three years prior in 2003 or 2004.

be hanging on the board there." As Cooper was leaving, Patrick asked, "Are my eyes still brown? Is there going to be any retaliation?" Neither Patrick nor Lattimore acknowledged that job expectations and job assignments were based on seniority.

On February 11, 2008, Associated Warden Simmon wrote Cooper and acknowledged that Cooper had filed a complaint against Harding. CDC allowed Cooper to withdraw her complaint against Harding.[4] No action was taken by CDC to investigate the conditions of the work place, and CDC did not require Harding to undergo sensitivity training.

On December 29, 2008, Capt. Frank Sanders ("Sanders") upbraided and orally reprimanded Cooper about her job performance as the Mail/Visiting/Operations Lieutenant, despite the absence of any complaints. On the same day, Sanders also unjustifiably disciplined Cooper in relation to 200 vehicles that had been submitted for clearance. Sanders gave Cooper on the job training and a job expectations memo, despite Cooper having properly performed her duties. Sanders refused to explain why he gave Cooper the training and the memo.

On February 7, 2009, Cooper was passed over for/denied overtime by Sergeant Todisco. Todisco was following her practice of overlooking employees whose seniority entitled them to be assigned overtime. Because of Cooper's seniority, she was entitled to the overtime. Cooper reported Todisco's policy to Sanders and now Associate Warden Tann, but they did nothing about it.

On April 7, 2009, Capt. Arrellano told Cooper that Tann had given instructions that Cooper was to notify Arrellano whenever Cooper varied her work hours. Cooper filed a grievance about this condition. Cooper withdrew her grievance because Arrellano promised to clarify the instructions. When Arrellano failed to respond further, Cooper re-filed the grievance.

On April 20, 2009, Cooper filed an excluded employee grievance, in which she alleged that she was being subjected to a hostile environment and retaliation.

On May 1, 2009, Tann attempted to set Cooper up by getting her to violate/approve of a violation of established prison policy. Tann sent two officers with the driver's licenses of

---

[4]This information is not contained in the TAC. However, it was expressly alleged in the Second Amended Complaint. See Doc. No. 28 at ¶ 9(e).

individuals who were attempting to attend a Prison event.  The captain told Cooper that an additional security check of the licenses was unnecessary, despite established procedures to the contrary.  Cooper did not listen to the officers, but instead followed the established procedures.

On May 3, 2009, visiting staff were notified of the discontinuation of the Get On The Bus program, and of the discontinuation of non-essential visiting at all CDC sites.  This had the effect of reducing some of Cooper's duties.

On May 4, 2009, Cooper notified Lattimore, Tann, Arrellano, and Chief Deputy Warden Cavazos of the existing back log of visiting applications, gate clearances, out-going letters for the Warden's signature, and assignments.

On May 7, 2009, Cooper was notified that visiting on weekends would be discontinued. Cooper was also notified that all visiting staff, except for Supervisors and the Family Visiting Officer, would not be redirected/reassigned on those days.

On May 8, 2009, Cooper was called into the Warden's office by Tann and informed by Cavazos that the position of Visiting Lieutenant was being deleted, that Cooper would be redirected to any vacant Lieutenant position, and that Cooper would be redirected to inmate appeals on Tuesdays and Fridays.

On May 11, 2009, Tann exempted a Visiting Sergeant from redirection, but did not exempt Cooper who outranked the sergeant and was entitled to be exempted.

On June 9, 2009, Capt. Scott called Cooper into her office for on the job training regarding administrative segregation.  It appears that Capt. Scott told Cooper that Cpt. Sanders had recommended Cooper for progressive discipline.[5]  Progressive discipline could result in punitive measures being taken against Cooper, which ranged from an oral warning to termination.  Cooper had not done anything to justify a recommendation for discipline.

On June 22, 2009, Warden Lattimore responded to the April 20, 2009, grievance. Lattimore informed Cooper of the prison's zero tolerance policy regarding hostile work environment, but found that Cooper's complaints were unsubstantiated.  Lattimore also stated that Cooper was not required to notify Capt. Arrellano about work schedule changes.

---

[5]There is no allegation, however, that Cooper was actually disciplined.

1    On July 31, 2009, at the direction of Tann, Capt. Scott spoke to Cooper on two subjects.

2  Scott told Cooper that Tann wanted Cooper written up.[6]

3    On October 2, 2009, Cooper returned from her regular days off and attempted to sign up

4  for overtime on Third Watch.  She was denied overtime by Sergeant Todisco.  Todisco told

5  Cooper that Operations Procedure C-065 was being utilized for correctional officers and

6  correctional lieutenants.  However, such a practice is contrary to Article 20 of the Departmental

7  Operations Manual Supplement.

8    On December 30, 2009, Cooper retired early after 22 years of service.  Cooper alleged

9  that the prolonged and sustained harassment by Defendants adversely affected her physical and

10  emotional health, including dangerously high blood pressure.

11    Cooper alleges for close to three years, beginning in December 2006, CDC subjected her

12  to a continuous stream of adverse employment action which turned her work into a hostile work

13  environment due to her race, gender, or protected activity.  Cooper alleges that the hostility was

14  expressed by CDC's failure to remonstrate against Sanchez.  Further, during the three year

15  period, Cooper was threatened with force and violence, continuously given excessive work loads,

16  denied opportunity to earn overtime, denied the necessary assistance to properly perform her

17  duties, demeaned with unjustified threats of on the job training, and threatened with sanctions

18  that could have led to her termination.  Cooper alleges that any reasonable African American

19  female under the circumstances would have resigned rather than continue to work in such a

20  hostile environment.

21

22    **LEGAL FRAMEWORK**

23    Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of the

24  plaintiff's "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A

25  dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the

26  absence of sufficient facts alleged under a cognizable legal theory.  Johnson v. Riverside

27  Healthcare Sys., 534 F.3d 1116, 1121 (9th Cir. 2008); Navarro v. Block, 250 F.3d 729, 732 (9th

28

_____

[6]There is no allegation, however, that Cooper was actually written up.

6

Cir. 2001).  In reviewing a complaint under Rule 12(b)(6), all allegations of material fact are taken as true and construed in the light most favorable to the non-moving party.  <u>Marceau v. Blackfeet Hous. Auth.</u>, 540 F.3d 916, 919 (9th Cir. 2008); <u>Vignolo v. Miller</u>, 120 F.3d 1075, 1077 (9th Cir. 1999).  However, the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  <u>In re Gilead Scis. Sec. Litig.</u>, 536 F.3d 1049, 1056-57 (9th Cir. 2008); <u>Sprewell v. Golden State Warriors</u>, 266 F.3d 979, 988 (9th Cir. 2001).  To "avoid a Rule 12(b)(6) dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009); <u>see</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Iqbal</u>, 129 S.Ct. at 1949.  The Ninth Circuit has distilled the following principles from *Iqbal* and *Twombly*:

> First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively.  Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

<u>Starr v. Baca</u>, 652 F.3d 1202, 1216 (9th Cir. 2011).  If a Rule 12(b)(6) motion is granted, "[the] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  <u>Lopez v. Smith</u>, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc).  That is, leave to amend need not be granted where amendment would be futile.  <u>Gompper v. VISX, Inc.</u>, 298 F.3d 893, 898 (9th Cir. 2002).

## DEFENDANTS' MOTION

### 1.      Title VII Hostile Work Environment - Race/Color & Gender (First Claim)

*Defendant's Argument*

Defendants argue that the TAC's allegations do not indicate an objectively hostile work

environment based on race because the only allegation that indicates racial hostility is an isolated comment by a prison visitor.  While the TAC contains slightly expanded allegations, there are no allegations that show Cooper was subjected to harassing conduct because of race, and the allegations do not indicate severe or pervasive conduct.  Also, the same arguments apply to Cooper's claim of gender discrimination.  There are no facts that indicate a severe and hostile environment based on gender.

### Plaintiff's Opposition

Cooper argues that the TAC shows that she engaged in protected activity and was subjected to hostile work environment by CDC.  The hostile environment began in October 2005 when CDC refused to do anything about Sanchez's use of a racial slur.  Employers can be liable for the harassing conduct of non-employees.  The TAC shows that Cooper was subjected to offensive comments by Harding and Warden Patrick in January 2008.  For comments to be actionable, they do not have to be explicitly racist or sexist.  Thereafter, Cooper was criticized, threatened with discipline, unjustly disciplined, set-up to violate procedures, denied overtime, and had her job duties reduced and the position of Visiting Lieutenant deleted.

### Legal Standard

Discriminatory harassment in the form of a hostile work environment based on race or gender may be actionable through Title VII.  See Galdamez v. Potter, 415 F.3d 1015, 1023 (9th Cir. 2005); Kortan v. California Youth Authority, 217 F.3d 1104, 1109-10 (9th Cir. 2000).  A plaintiff alleging a hostile work  environment based on race or gender must show: (1) that she was subjected to verbal or physical conduct based on her race or gender; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive work environment.  See Galdamez, 415 F.3d at 1023; Kortan, 217 F.3d at 1109-10.  The work environment must be both subjectively and objectively hostile.  Galdamez, 415 F.3d at 1023; Kortan, 217 F.3d at 1110.  In determining whether a work environment is objectively hostile, courts examine all of the circumstances, including the frequency of discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes

with an employee's work performance.  See Galdamez, 415 F.3d at 1023; Nichols v. Azteca

Rest. Enters., Inc., 256 F.3d 864, 872 (9th Cir. 2001).  "Simple teasing, offhand comments, and

isolated incidents (unless extremely serious)" will not amount to an objectively hostile work

environment.  Dominguez-Curry v. Nevada Transp. Dept., 424 F.3d 1027, 1034 (9th Cir. 2005);

Manatt v. Bank of Am., 339 F.3d 792, 798 (9th Cir. 2003).  "The required severity of the conduct

varies inversely with its pervasiveness and frequency."  Galdamez, 415 F.3d at 1023; Nichols,

256 F.3d at 872.  The objective hostility of the environment is considered from the perspective of

a reasonable person with the same characteristics as the plaintiff.  See Craig v. M&O Agencies,

496 F.3d 1047, 1055 (9th Cir. 2006); Galdamez, 415 F.3d at 1023.  Title VII is not a "general

civility code."  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998); EEOC v. Prospect

Airport Servs., 621 F.3d 991, 998 (9th Cir. 2010).  To violate Title VII, the conduct at issue must

be sufficiently extreme that it amounts "to a change in the terms and conditions of employment."

Faragher, 524 U.S. at 788; Craig, 496 F.3d at 1055.

*Discussion*

1.       Racial Hostile Environment

Here, the conduct identified in the TAC spans a period of just over four years, October

2005 to December 2009.  There are multiple actions by CDC employees that Cooper identifies as

contributing to a racially hostile work environment.  However, the allegations do not indicate that

an objectively hostile work environment based on race existed.

The TAC describes one episode that expressly relates to race.  In October 2005, while

speaking to another lieutenant on the telephone, Sanchez twice referred to Cooper as a "nigger."

Sanchez was irate and complaining to the other lieutenant because Cooper enforced the

visitations rules against Sanchez.  Although Cooper filed an internal complaint with the prison's

EEO Coordinator, the complaint was essentially dismissed in December 2006, and CDC did not

remonstrate against Sanchez.

There is no doubt that the term "nigger" is an invidious, demeaning, and unacceptable

racial slur.  See McGinest v. GTE , 360 F.3d 1103, 1116 (9th Cir. 2004).  Nevertheless, the

failure of CDC to do anything about ex-felon Sanchez's isolated, irate, telephoned comment is

itself an isolated, singular incident.  It is recognized that isolated and sporadic instances in which offensive language is used, including racial epithets, are by themselves insufficient to constitute a racially hostile work environment.  See Faragher, 524 U.S. at 788; Harris v. Forklift Sys., 510 U.S. 17, 21 (1996); Butler v. Alabama DOT, 536 F.3d 1209, 1213-14 (11th Cir. 2008); Manatt, 339 F.3d at 799; Concey v. N.Y. State Unified Court Sys., 2011 U.S. Dist. LEXIS 113620, 53-55 (S.D. N.Y. Sept. 30, 2011) (and cases cited therein).  The failure of CDC to remonstrate in some manner against Sanchez's statement may be considered under the totality of the circumstances.  By itself, however, the failure to remonstrate is insufficient as a matter of law to alter the terms and conditions of Coopers employment and did not create an objectively, racially hostile work environment.[7]  See id.

Cooper is correct that it is possible for an employer to be liable under Title VII for a hostile work environment created by customers/third parties.  See Freitag v. Ayers, 463 F.3d 838, 847 (9th Cir. 2006); Galdamez, 415 F.3d at 1022.  However, in *Galdamez*, the plaintiff was subjected to comments and acts over a three year period, and those comments and acts included "not only offensive remarks, but also racially charged references to potential mob violence, indirect threats to physical safety, and property damage."  Galdamez, 415 F.3d at 1023-24.  That is, the facts in that case indicated a subjectively and objectively hostile work environment created through multiple discriminatory occurrences and based on the plaintiff's national origin.  See id. *Galdamez* did not involve isolated incidents.  Similarly, in *Freitag*, a female prison guard "was repeatedly exposed to conduct of a sexual nature" by inmates, which the Ninth Circuit described as "a constant barrage of sexual abuse."  Freitag, 463 F.3d at 849-50.  Thus, *Freitag* involved continuous sexual conduct, and did not involve isolated incidents.  The facts alleged in the case at bar are materially different from the facts in *Freitag* and *Galdamez*.

Cooper also contends that she was subjected to offensive comments by then Warden Patrick.  Relying on *Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006), Cooper contends that the

---

[7]Also, the failure to remonstrate appears to have been the decision of EEO Coordinator Simmon.  However, there are no allegations that Simmon did or said anything against Cooper after December 2006.  The TAC indicates that Simmon acknowledged receiving Cooper's complaint against Harding, and also alleges that Harding was not investigated or required to undergo sensitivity training.  See TAC ¶ 9(e).  However, as previously noted, the Second Amended Complaint alleged that Cooper withdrew her complaint against Harding.  See Doc. No. 28 at ¶ 9(e).

allegations of Patrick's offensive comments, which are not explicitly racist, are nevertheless plausibly racist as a matter of law and that discovery is necessary to ascertain the true meaning of the comments.  *Ash* was a disparate treatment case in which two African-Americans claimed that they were denied promotion because of racial animus.  See *Ash*, 546 U.S. at 455.  The Court of Appeals had held that the decision maker's use of the term "boy," without a modifier such as "black boy" or "white boy," was not evidence of racial animus.  The Supreme Court disagreed and held, "Although it is true the disputed word will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign.  The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage."  Id. at 456.

Ash is not helpful to Cooper.  First, as indicated, *Ash* was a disparate treatment case, it was not a hostile work environment case.  *Ash* was concerned with discussing evidence that might reflect racial animus with respect to a single hiring decision.  *Ash* contained no discussions about the objective hostility of the work environment.  Second, while *Ash* holds that seemingly "benign" words may in fact be racist as revealed through context, inflection, tone, custom, and historical usage, there are no allegations in the TAC that actually supports an application of *Ash*.  There are no allegations that Patrick's comments were intended to be racist or had a racial meaning due to context, inflection, tone, custom, and/or historical usage.  Third, even if Patrick's comments on January 22, 2008, were racist or had a racial meaning, that is only the second instance of racial comments occurring over a 4 year period.  Moreover, Lattimore succeeded Patrick as warden of the prison sometime prior to April 2009.  There are no allegations that Patrick said or did anything to Cooper after the January 22, 2008, meeting.  The single failure to remonstrate against Sanchez in 2005/2006 and the single instance of a cryptic, offensive comment in 2008 were isolated and sporadic events that did not alter the terms and conditions of employment.  See Faragher, 524 U.S. at 788; Harris, 510 U.S. 17, 21 (1996); Butler, 536 F.3d at 1213-14; Manatt, 339 F.3d at 799; Concey., 2011 U.S. Dist. LEXIS 113620 at *53-*55 (and cases cited therein).  Together, the two instances do not constitute an objectively, racially hostile work environment.  See id.

1    Cooper has alleged conduct that created an uncomfortable working environment for her.

2    She also alleges that a reasonable African-American in her position would have found a racially

3    hostile work environment.  Despite this legal conclusion, the allegations do not indicate that any

4    harassing conduct was because of Cooper's race or that any racial harassment was sufficiently

5    severe and pervasive.  The only events that are related to race are at best two isolated and

6    sporadic events, those events did not alter the terms or conditions of employment, and the

7    persons responsible for those events (speaking the offensive comments or not remonstrating) did

8    not do or say anything further against Cooper.  A reasonable African-American would not find

9    the alleged work environment to be sufficiently hostile.  Because the TAC does not plausibly

10   indicate an objectively pervasive and severe racially hostile work environment, dismissal of this

11   claim is appropriate.  <u>Faragher</u>, 524 U.S. at 788; <u>Galdamez</u>, 415 F.3d at 1023; <u>Manatt</u>, 339 F.3d

12   at 799.

13        2.    Gender Hostile Work Environment

14        This cause of action suffers from the same problems as Cooper's racial hostile work

15   environment.  The only factual allegation that in any way relates to gender was the comments

16   made by Cpt. Harding in January 2008.  However, the comments were partially self-deprecating,

17   and thus directed at men.  Moreover, Harding's comments constitute a single isolated incident

18   that occurred on one day during one conversation.  The comments were not particularly severe.

19   As a mild and isolated incident, Harding's comments alone are insufficient as a matter of law to

20   create a hostile work environment.  <u>See</u> <u>Faragher</u>, 524 U.S. at 788.

21        There are insufficient allegations to indicate that any harassing conduct was because of

22   gender.  There are no factual allegations that indicate a severe and pervasive hostility towards

23   women, and there are no factual allegations that plausibly indicate that a reasonable woman

24   would find the working environment to be hostile.  Instead, the TAC alleges conduct against

25   Cooper and seems to rely simply on the fact that Cooper is a woman.  That is not sufficient.

26   While the allegations reflect conduct against Cooper that may be characterized as disrespectful,

27   unfair, and unwarranted, they do not reflect hostility against women in any way.  Because the

28   TAC does not plausibly indicate an objectively pervasive and severe gender hostile work

environment, dismissal of this claim is appropriate.

### 2.    Title VII – Retaliation (Sixth Claim)

*Defendant's Argument*

CDC argues that dismissal of this claim is appropriate because the TAC does not indicate a causal connection between protected activity and adverse employment actions.  The TAC does not indicate that those who caused the allegedly retaliatory conduct were aware of Cooper's protected activity.

*Plaintiff's Opposition*

Cooper argues that the TAC includes instances of protected activity and allegations which show that her employer knew or should have known about her protected activity.  The individuals who subjected her to adverse employment actions were the Warden, Deputy Warden, Associate Warden, and Custody Captains.  Their knowledge is imputed to CDC, and the allegations in Paragraph 9, subsections d, f, g, h, i, j, k, o, p, q, r, s, and t all constitute adverse employment actions.

*Legal Standard*

Title VII protects employees from retaliation for either participating in an investigation, proceeding or hearing under Title VII, or for opposing an employment practice that is unlawful under Title VII.  See 42 U.S.C. § 2000e-3(a).  Thus, an "employer can violate the anti-retaliation provisions of Title VII in either of two ways: (1) if the adverse employment action occurs because of the employee's opposition to conduct made unlawful [by Title VII]; or (2) if it is in retaliation for the employee's participation in the machinery set up by Title VII to enforce its provisions."  Hashimoto v. Dalton, 118 F.3d 671, 680 (9th Cir. 1997).  For an employee's "opposition" to be protected, the employer's conduct which the employee opposed "must fairly fall within the protection of Title VII to sustain a claim of unlawful retaliation."  Learned v. Bellevue, 860 F.2d 928, 932 (9th Cir. 1988).  Further, while it is not necessary that the employer's conduct actually violate Title VII, the employee must have a good faith, reasonable belief that the employer's conduct does violate Title VII.  Benoit v. Tech. Mfg. Corp., 331 F.3d

166, 175 (9th Cir. 2003).  In order to establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) she engaged in activity protected under Title VII; (2) her employer subjected her to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action.  See Nilsson v. City of Mesa, 503 F.3d 947, 953-54 (9th Cir. 2007).  The second element requires a showing that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006); Morales-Vallellanes v. Potter, 605 F.3d 27, 33 (1st Cir. 2010).  As to the third element, "causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." Van Asdale v. Int'l Game Tech., 577 F.3d 989, 1002 (9th Cir. 2009).  However, the plaintiff must show that the particular decision maker who authorized or committed the adverse employment action was aware that the plaintiff had engaged in protected activity.  See Reed v. Avis Budget Group, Inc., 2012 U.S. App. LEXIS 5764, *2 (9th Cir. Mar. 20, 2012); Raad v. Fairbanks N. Star Borough, 323 F.3d 1185, 1197 (9th Cir. 2003); Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982); Gunther v. County of Washington, 623 F.2d 1303, 1316 (9th Cir. 1979).

*Discussion*

The Court sees four instances of Cooper engaging in Title VII protected activity: providing information as a witness as part of a retaliation investigation in August 2003, complaining about Sanchez's comments in October 2005, complaining about Harding's comments in January 2008, and complaining about retaliation/hostile work environment in April 2009.[8]  Cf. Benoit, 331 F.3d at 175; Learned, 860 F.2d at 932.

In her opposition, Cooper contends that twelve paragraphs in the TAC identify adverse employment actions.  See Opposition at 9:3-4.  The Court is not convinced that each of these twelve actions would have dissuaded a reasonable worker from making or supporting a charge of

---

[8]Cooper's opposition contends that her complaints about Hack in December 2005 constitute protected conduct.  However, there is nothing in the TAC that indicates that Cooper's complaint was one concerning race or gender.  That is, nothing indicates that the complaints or the incidents with Hack fairly fell within the protection of Title VII.  See Learned, 860 F.2d at 932.

discrimination.  <u>White</u>, 548 U.S. at 68.  For example, it does not appear that Warden Patrick's

offensive comments as alleged in Paragraph 9(d), or exempting another employee from

redirection as alleged in Paragraph 9(p), constitute adverse employment actions.[9]  Cf. <u>id.</u>

Nevertheless, assuming that the remaining ten paragraphs constitute adverse employment actions

as described in *White*, the allegations do not plausibly indicate a causal connection.  There are no

allegations that the specific individuals who inflicted the particular adverse employment actions

on Cooper had actual knowledge of Cooper's four protected activities.  Without actual

knowledge of protected activity by the individual who causes an adverse employment action to

occur, there can be no retaliation.  <u>See</u> <u>Reed</u>, 2012 U.S. App. LEXIS 5764 at *2; <u>Raad</u>, 323 F.3d

at 1197; <u>Cohen</u>, 686 F.2d at 796; <u>Gunther</u>, 623 F.2d at 1316.

Cooper's argument appears to focus on the collective knowledge of CDC.  It is true that

someone in CDC knew that Cooper engaged in protected activity.  However, that is not

sufficient.  As the cases cited by the Court indicate, the improper intent that is imputed to the

employer is the intent of the individual who is responsible for the adverse employment action.  If

that individual did not have knowledge of the protected activity, then that individual's conduct

could not possibly have been done as a result of protected activity.  Cooper's argument does not

sufficiently address *Reed*, *Raad*, *Cohen*, and *Gunther*.

Because the TAC does not allege actual knowledge by the particular individuals who

caused the alleged adverse employment actions to occur, the TAC fails to allege a viable

retaliation claim.  <u>See</u> <u>id.</u>  Dismissal is appropriate.

### **3.**   **Title VII – Retaliatory Hostile Work Environment (Second Claim)**

*Defendant's Argument*

CDC argues that, while filing a complaint against Harding was protected activity, there is

no connection between filing that complaint and the conduct/actions that followed.  Further,

there are no allegations that those who allegedly retaliated against Cooper actually knew about

---

[9]In terms of "redirection," it is the act of "redirecting" that constitutes an adverse employment action, and the allegations and opposition indicate that Cooper was redirected.  That another employee was exempt from redirection may give further meaning to Cooper being redirected, but it is not a separate adverse employment action.

Cooper's complaint.  If the person who caused the adverse employment action did not have knowledge of the protected activity, then there can be no retaliation.

*Plaintiff's Opposition*

Cooper does not expressly address this claim.

*Discussion*

It is possible for words or conduct that are done in retaliation for protected conduct to eventually rise to the level of a hostile work environment.  See Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1189 (9th Cir. 2005).  However, Defendants are correct.  For the same reason that Cooper's sixth claim for retaliation fails, so too fails this claim.  See Reed, 2012 U.S. App. LEXIS 5764 at *2; Raad, 323 F.3d at 1197; Cohen, 686 F.2d at 796; Gunther, 623 F.3d at 1316. Dismissal is appropriate.


**4.      Title VII – Constructive Discharge (Third Claim)**

*Defendant's Argument*

CDC argues that the TAC's allegations do not indicate conditions that are sufficiently severe or intolerable.  The Court dismissed this claim in its prior order, but the only new allegations concern a fellow officer slamming a door and hitting a wall in Cooper's presence. This conduct occurred more than 4 years before Cooper's retirement.  It is too far removed to be probative, and there is no indication that the conduct was actually directed at Cooper.  Like the prior complaint, the TAC fails to plausibly indicate intolerable working conditions.

*Plaintiff's Opposition*

Cooper alleges that the TAC shows a continuous pattern of discriminatory treatment.  The TAC alleges that she complained about discriminatory treatment, including a complaint that she was being subjected to a hostile work environment and retaliation, but her complaints were ignored.  A pattern of antagonism following protected conduct is sufficient to raise a plausible inference of causation that is sufficient to defeat a motion to dismiss.  Further, *Huskey* is distinguishable from this case because it did not involve a Rule 12(b)(6) motion and because the plaintiff in *Huskey* was told that he was welcome to stay in his position of employment.

1        *Legal Standard*

2        Title VII encompasses employer liability for the constructive discharge of an employee.

3   Pennsylvania State Police v. Suders, 542 U.S. 129, 143 (2006).  "When an employee

4   involuntarily resigns in order to escape intolerable and illegal employment requirements to which

5   he or she is subjected because of race, color, religion, sex, or national origin, the employer has

6   committed a constructive discharge in violation of Title VII."  Morgan v. Ford, 6 F.3d 750, 755

7   (11th Cir. 1993); see also 42 U.S.C. § 2000e-2(a).  A constructive discharge also may constitute

8   an "adverse employment" action where the constructive discharge was done in retaliation for

9   opposing unlawful conduct under Title VII or for participating in a process under Title VII.  See

10  Hernandez-Torres v. Intercontinental Trading, 158 F.3d 43, 47 (1st Cir. 1999); Jordan v. Clark,

11  847 F.2d 1368, 1377 (9th Cir. 1988); see also 42 U.S.C § 2000e-3(a).  "A constructive discharge

12  occurs when the working conditions deteriorate. . . to the point that they become sufficiently

13  extraordinary and egregious to overcome the normal motivation of a competent, diligent, and

14  reasonable employee to remain on the job to earn a livelihood and to serve his or her employer."

15  Poland v. Chertoff, 494 F.3d 1174, 1184 (9th Cir. 2007); Brooks v. City of San Mateo, 229 F.3d

16  917, 930 (9th Cir. 2000).  The bar for a constructive discharge is set high.  Poland, 494 F.3d at

17  1184.  Constructive discharge requires a showing that a reasonable person in the plaintiff's

18  position would have felt that she was forced to quit because of intolerable and discriminatory

19  working conditions.  Huskey v. City of San Jose, 204 F.3d 893, 900 (9th Cir. 2000).  Thus, a

20  plaintiff alleging a Title VII constructive discharge must show that: (1) the working conditions

21  were so intolerable that a reasonable person would have felt forced to resign; and (2) the

22  intolerable working conditions must be intolerable because of unlawful discrimination.  Simpson

23  v. Borg-Warner Auto., Inc., 196 F.3d 873, 877 (7th Cir. 1999); cf. Huskey, 204 F.3d at 900;

24  Morgan, 6 F.3d at 755.  "Where a plaintiff fails to demonstrate the severe or pervasive

25  harassment necessary to support a hostile work environment claim, it will be impossible for her

26  to meet the higher standard of constructive discharge:  conditions so intolerable that a reasonable

27  person would leave the job."  Manatt, 339 F.3d at 804; Brooks, 229 F.3d at 930.  Whether

28  working conditions have become so intolerable as to justify a reasonable employee's decision to

resign is normally a question of fact for the jury, but, in appropriate cases, the court may

determine that a plaintiff's allegations are insufficient to establish intolerable working conditions.

Huskey, 204 F.3d at 900.

*Discussion*

The TAC alleges a constructive discharge under 42 U.S.C. § 2000e-2(a) and under 42

U.S.C. § 2000e-3(a).  Thus, the TAC's allegations must plausibly indicate intolerable working

conditions that were created either because Cooper engaged in protected Title VII conduct or

because of Cooper's race or gender.  See 42 U.S.C. §§ 2000e-2(a), 2000e-3(a); Huskey, 204 F.3d

at 900; Simpson, 196 F.3d at 877; Hernandez-Torres, 158 F.3d at 47; Morgan, 6 F.3d at 755;

Jordan, 847 F.2d at 1377.

With respect to retaliatory constructive discharge, the TAC does not specifically identify

what protected conduct served as the basis for the retaliatory constructive discharge.  More

importantly, however, as discussed above, of the Title VII protected conduct that appears to be

identified in the TAC, the TAC nowhere alleges knowledge by the individuals responsible for the

discriminatory/retaliatory conduct.  Again, if the pertinent actors did not have knowledge of the

protected conduct, then the protected conduct could not be the cause of retaliatory actions.  See

Reed, 2012 U.S. App. LEXIS 5764 at *2; Raad, 323 F.3d at 1197; Cohen, 686 F.2d at 796;

Gunther, 623 F.3d at 1316.

With respect to a constructive discharge due to Cooper's race or gender, as discussed

above, the TAC does not plausibly allege an objectively pervasive and severe hostile work

environment based on race or gender.  At best, the TAC alleges two isolated incidents related to

race.  Further, the TAC contains one incident relating to gender, the comment by Harding in

January 2008, but that comment was largely related to men and self-deprecating.  The incidents

are isolated, non-threatening, and non-severe.  As a matter of law, these incidents did not alter

the terms and conditions of employment.  See Faragher, 524 U.S. at 788.  If the allegations do

not plausibly show a hostile work environment based on race or gender, then they also do not

plausibly show a constructive discharge that was based on race or gender.  See Manatt, 339 F.3d

at 804; Brooks, 229 F.3d at 930.

Because there are no allegations of actual knowledge of Cooper's protected activity by the relevant actors, and because the allegations do not show a hostile work environment because of either gender or race, this cause of action fails.[10]

### 5.      Title VII - Terms & Conditions - Race & Gender (Fourth & Fifth Claims)

*CDC's Argument*

Defendants argue that Cooper has failed to allege a constructive discharge, and thus has failed to allege any adverse employment actions.  Further, this claim fails because there are no facts which indicate that other employees were treated more favorably, and thus, the allegations do not plausibly indicate that Cooper was treated differently because of her race or gender.

*Plaintiff's Opposition*

Cooper argues that these claims are not barred by the applicable statute of limitations.

*Legal Standard*

Title VII prohibits discrimination in the employment context "because of" *inter alia* an employee's race or gender.  See 42 U.S.C. § 2000e-2(a)(1); Dominguez-Curry, 424 F.3d at 1038-39.  One way of showing discrimination because of race or gender is through direct evidence, such as the use of racial or sexist epithets by decision makers or being told that the adverse conduct is occurring because of race.  Dominguez-Curry, 424 F.3d at 1038-39.  Another method of showing that discrimination is because of race or gender is by establishing a *prima facie* case of discrimination through the *McDonnel Douglas* framework, which requires a plaintiff to show: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) similarly situated employees not in her protected class received more favorable treatment.  Kang v. U. Lim Am., Inc., 296 F.3d 810, 818 (9th Cir. 2002).  An "adverse employment action" is an employment action that "materially affects the terms, conditions, or privileges of employment."  Chuang v. University of Cal. Davis, Bd. of Trustees, 225 F.3d 1115, 1116 (9th Cir. 2000).

---

[10]Given the Court's conclusion, it is unnecessary to discuss the factual allegations in relation to *Huskey*.

1          *Discussion*

2          Cooper's opposition is inadequate.  The section of the opposition that mentions the fourth

3   and fifth causes of action only addresses a statute of limitations argument, and such an argument

4   is not made by CDC.

5          With respect to the TAC, Cooper's allegations are too conclusory.  There is an absence of

6   factual allegations that plausibly indicate that Cooper was treated disparately because of her race

7   or her gender.  There are no allegations that other similarly situated employees, who were not of

8   Cooper's race or gender, were treated more favorably.  There also are no allegations that the

9   pertinent decision makers used racial or sexual epithets or told Cooper that what was occurring

10  was because of her race or gender.  To be sure, Sanchez used an invidious racial slur and there

11  was no remonstration by CDC.  However, the Sanchez incident occurred in late 2005, and the

12  adverse conduct identified in Cooper's opposition occurred mostly in 2008 and 2009.  This is a

13  significant lapse of time.  Importantly, the TAC indicates that the decision not to remonstrate was

14  made by the EEO Coordinator Simmon.  See TAC ¶ 9.  As discussed above, there is no

15  indication that Simmon, or anyone else associated with, or anyone who had knowledge of, the

16  Sanchez incident harassed or treated Cooper adversely thereafter.  Cooper has also argued that

17  Warden Patrick's cryptic comments may have been racial, but the TAC does not allege that the

18  comments were in fact racial, nor does Cooper identify any adverse employment actions that

19  were performed by Patrick.[11]  Finally, Cooper relies on the comments made by Cpt. Harding.

20  However, those comments were isolated (occurring on one day during one conversation), partly

21  directed at men/himself, and were not severe.  The failure of CDC to require that Harding

22  undergo sensitivity training or apparently to discipline Harding is insufficient to show that

23  Cooper was harassed or treated disparately because of her gender.[12]

24          While Cooper does not need to marshal and allege her entire case, she needs to allege

25

26          [11]The comments made to Cooper by Patrick on January 22, 2008, would not have materially affected the
terms, conditions, or privileges of employment.  Cf. Chuang, 225 F.3d at 1126 with TAC ¶ 9(d).

27

28          [12]The Court again notes that Cooper had previously alleged that she withdrew her complaint against
Harding.  See Doc. No. 28 at ¶ 9(e).  With the withdrawal of the complaint, it is hardly surprising that CDC did not
pursue the matter further.

enough facts that plausibly indicate that she was treated disparately because of her race or gender. See Iqbal, 129 S.Ct. at 1949; Starr, 652 F.3d at 1216.  The TAC does not contain sufficient facts, and instead relies on legal conclusions and isolated incidents.  Thus, dismissal of these causes of action is appropriate.

**CONCLUSION**

Defendants move to dismiss all of the Title VII claims against them.

Dismissal of the first cause of action for hostile work environment based on race or gender is appropriate because the TAC does not plausibly indicate an objectively pervasive and severe hostile work environment because of race or gender.

Dismissal of the second and sixth causes of action is appropriate because the TAC fails to allege knowledge of Cooper's Title VII protected activity by the particular individuals responsible for the for identified adverse employment actions.

Dismissal of the third cause of action is appropriate for the same reasons as the first, second, and sixth causes of action.  There is insufficient evidence of a hostile work environment based on race, gender, or protected activity.  If a Title VII hostile work environment fails, a Title VII constructive discharge claim will also fail.

Dismissal of the fourth and fifth causes of action is appropriate because the TAC does not plausibly allege that any disparate treatment occurred because of Cooper's gender or race.

In the Court's prior order, the Court dismissed these causes of action for essentially the same reasons.  The TAC does contain additional allegations, but those allegations do not address the problems that were discussed in the prior order.  Some of these deficiencies appear to be readily capable of correction.  The fact that Cooper has not done so indicates that she is either unwilling or unable to cure the repeated deficiencies.  Additionally, Cooper has not requested leave to amend in the event that the Court grants CDC's motion.  This also indicates that the TAC represents the best allegations that can be made consistent with Federal Rule of Civil Procedure 11.  For these reasons, dismissal of the TAC will be without leave to amend.

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.   Defendants' motion to dismiss is GRANTED and the first, second, third, fourth, fifth, and sixth causes of action are DISMISSED without leave to amend; and

2.   Defendants shall file an answer within ten (10) days of service of this order.

IT IS SO ORDERED.

Dated:     May 10, 2012     

_____
CHIEF UNITED STATES DISTRICT JUDGE